UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| BRIAN W., | CASE NO. C24-0154-KKE |
|---|---|
| Plaintiff(s), | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE |
| v. | |
| PREMERA BLUE CROSS OF WASHINGTON, et al., | |
| Defendant(s). | |

Plaintiff Brian W. sues Defendant Premera Blue Cross of Washington ("Premera") over its decision to deny benefits for his son's mental health treatment at two residential care facilities. The Court concludes that Premera incorrectly denied Brian W.'s claims and awards benefits for the treatments at both facilities.

As to the first facility, Premera initially denied benefits based on the deadline for filing claims; then reversed that decision and, instead, found Brian W. failed to obtain prior authorization; and then changed course again and denied benefits based on the facility's licensure status. Premera now abandons that reason as well and instead argues Brian W. cannot recover benefits because his son's treatment was not "medically necessary." Because Premera is obligated to defend its decision based on the reasons it disclosed when denying the claim, the Court rejects this newfound reliance on medical necessity. The Court also finds that the record does not support

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 1

the reason Premera actually gave for the denial—the facility's licensure status—and so awards benefits.

As to the second facility, Premera disclosed that it was denying the claim based on lack of medical necessity. But when Brian W. attempted to appeal that determination, Premera never responded; and it now concedes it misplaced the appeal. Premera defends its denial based on criteria developed by a third-party organization that are referenced nowhere in the benefits plan. Reviewing the denial *de novo*, the Court concludes—consistent with every mental health practitioner who examined Brian W.'s son during the relevant times—that the treatment was, in fact, "medically necessary" as that term is defined in the plan.

Accordingly, the Court grants Brian W.'s motion for judgment in his favor and denies Premera's motion for summary judgment.

## I.    BACKGROUND

Brian W. filed this lawsuit seeking to recover benefits for residential mental health treatment provided to his son—referred to in this case as A.W.—under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Dkt. No. 1 at 7. Brian W. also claims that Premera breached its fiduciary duty in denying the claims and seeks equitable relief. *Id.* at 8; *see* 29 U.S.C. § 1132(a)(3). Premera filed a motion for summary judgment under Federal Rule of Civil Procedure 56 (Dkt. No. 45), and Brian W. filed a cross-motion for judgment under Rule 52 and a motion to strike (Dkt. No. 59). The motions are now fully briefed (Dkt. Nos. 66, 68), and the Court has heard oral argument (Dkt. No. 70). The parties also submitted supplemental briefing concerning the generally accepted standards of medical practice for assessing A.W.'s treatment. Dkt. Nos. 75, 77. The findings of fact below set out additional background concerning A.W.'s mental health history, his treatment, and Premera's decisions denying both sets of claims.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 2

## II.   PROCEDURAL ISSUES

Before addressing the facts and arguments, however, the Court must determine whether to treat the pending motions as cross-motions for summary judgment under Rule 56 or cross-motions for judgment under Rule 52.  "The answer depends on what standard of review the Court applies" in examining Premera's claim denials.  *H.N. v. Regence BlueShield*, No. 15-CV-1374 RAJ, 2016 WL 7426496, at *1 (W.D. Wash. Dec. 23, 2016) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Here, the parties agree that *de novo* review applies (Dkt. No. 45 at 15; Dkt. No. 59 at 19), and the Court concurs.  *See N.C. v. Premera Blue Cross*, 667 F. Supp. 3d 1102, 1106 (W.D. Wash. 2023), *aff'd*, No. 23-35381, 2024 WL 2862586 (9th Cir. June 6, 2024) (holding that Washington law prohibiting discretionary clauses in insurance plans "requires de novo review") (citing Wash. Admin. Code § 284-44-015); *Witney v. United of Omaha Life Ins. Co.*, No. 2:20-CV-01273-RAJ, 2022 WL 4483179, at *10 (W.D. Wash. Sep. 27, 2022) ("[*De novo*] is the proper standard of review where, as here, the Plan does not confer discretion on the administrator, as Washington law prohibits the inclusion of such clauses in disability insurance policies.").

Brian W. contends that "in an ERISA *de novo* claim for benefits[,]" Rule 52, rather than Rule 56, is "the proper vehicle[.]"  Dkt. No. 59 at 19 n.5.  And while it styles its motion a summary judgment motion, at oral argument, Premera agreed the Court may construe the motions as Rule 52 cross-motions for judgment.  Dkt. No. 78 at 26 (stating that the Court "would be correct to decide [the motions] under either stand[ard]"); *see also* Dkt. No. 45 at 15 (stating "this will be a bench trial on the papers with the District Court acting as the finder of fact" (internal quotation marks omitted) (quoting *Kieserman v. Unum Life Ins. Co. of Am.*, 574 F. Supp. 3d 896, 900 (W.D. Wash. 2021))).  Accordingly, the Court will adopt the parties' suggestion and follow the procedure outlined in *Kearney v. Standard Ins. Co.*, which requires the Court to weigh evidence in the written

record, find facts, and make legal conclusions. 175 F.3d 1084, 1095 (9th Cir. 1999) (holding that an ERISA bench trial may "consist[] of no more than the trial judge []reading [the administrative record]"); *see also Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[ ] ... is a bench trial and not the disposition of a summary judgment motion").

Consistent with this approach, the Court makes the following findings of fact and conclusions of law.

### III.    FINDINGS OF FACT[1]

**A.      The Parties**

1.    Brian W. is a resident of Washington who participated in a fully insured employee welfare benefit plan issued by Premera called the Information Technology Industry Health Trust Your Choice Titanium 200 Heritage Network Plan (the "Plan"). Dkt. No. 1 ¶¶ 6–7. Brian W. is A.W.'s father and paid for A.W.'s mental health treatment. *Id.* ¶¶ 11, 13. Premera is the insurer and claims administrator for the Plan. *Id.* ¶ 5; Dkt. No. 45 at 2.

**B.      The Plan Terms and InterQual Guidelines**

2.    The Plan covers medically necessary inpatient mental health treatment, including residential treatment, provided by an entity that meets the Plan's definition of a "provider[.]" R1293–1295, R1369.[2]  As relevant, "[i]n states other that Washington[,]" a "provider" is any "health care practitioner[]" or "facilit[y] licensed or certified consistent with the laws and

---

[1] Premera's administrative record in this case is profoundly disorganized, lacks chronologically ordered exhibits or an index, and includes many documents that are incomplete or interrupted by pages of separate documents without explanation.  As Brian W. observes, "Premera offers no explanation for this[.]" Dkt. No. 59 at 16 n.4.  The Court has done its best to cite the record appropriately.

[2] Premera's administrative record is Bates stamped "PRE_BW_[page number]." *See* Dkt. Nos. 63, 64.  Consistent with the parties' briefs, the Court cites to Premera's administrative record as "R[page number]."

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 4

regulations of the state in which they operate" that "provide[s] health care services consistent with applicable state requirements."  R1350.  The Plan defines "Medically Necessary" as:

> Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> - In accordance with generally accepted standards of medical practice;
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
> - Not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.
>
> For these purposes, "generally accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors.

R1349.

3.  Premera uses medical criteria licensed from an organization called InterQual to determine medical necessity for mental health residential treatments.  Dkt. No. 45 at 10.  The 2017 InterQual criteria[3] require that at least one of the following symptoms be present and persistent or repetitive over a period of at least six months:

- Aggression unresponsive to adult de-escalation or direction
- Angry outbursts causing harm to self or others or property
- Daredevil behavior
- Delusions
- Disorganized thoughts or speech or behavior
- Fire setting
- Hallucinations

---

[3] Although the record contains more recent versions of the InterQual criteria, Premera's brief states—without explanation—that it uses the 2017 version.  Dkt. No. 45 at 10.  At times, however, Premera cites the 2018 version. *Id.* at 11 (citing R1628–1629).  The relevant portions appear similar across the various versions, so the Court cites the 2017 criteria in light of Premera's representation that it uses this version.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 5

- Hypomanic symptoms increased
- Nonsuicidal self-injury
- Poor impulse control with harm to self or others and unresponsive to adult intervention
- Repeated arrest or confirmed illegal activity
- Runaway for more than 24 hours and places self in dangerous situations
- Sexually inappropriate or abusive
- Persistent violation of court orders

R1548.  To be deemed medically necessary, the InterQual criteria also require that a residential treatment facility provide all the following services:

- Awake adult supervision 24 hours per day
- Clinical assessment at least 1 time per day
- Individual, group, or family therapy at least 3 times per week
- Medical history and physical examination within 6 months prior to admission or within 30 days after admission
- Medication reconciliation initiated within 24 hours
- Multidisciplinary treatment plan within 1 week
- Nursing staff on−site or on−call 24 hours per day
- Parent training for patient's parents or guardians if return to family is expected
- Preliminary discharge plan initiated with 24 hours
- Psychiatric evaluation, initial within 1 business day, subsequent at least 1 time per week
- Psychosocial assessment and substance evaluation within 48 hours
- School or vocational program
- Toxicology screen, quantitative drug analysis, self−help, 12−step, or education group as needed.

4.   The InterQual criteria are not included, mentioned, or incorporated by reference in the Plan. *See* R1269–1354.  Their first page states that the criteria are "confidential and proprietary" and "cannot alone either (a) resolve medical ambiguities of particular situations; or (b) provide the sole basis for definitive decisions."  R1531.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 6

**C.      A.W.'s Development and Mental Health History**

5.  A.W. was born in Seattle in 2005.  PAR113.[4]  At a young age, he began exhibiting impulsive and sometimes aggressive behaviors, which his parents understood were triggered by feelings of stress.  R1230.  When he was two years old, A.W. was accidentally locked in a car with his four-month-old brother.  *Id.*  Upon realizing his mother could not get in the car, he proceeded to hit his brother with a wooden toy, causing bruising and scratches across the baby's head and face.  *Id.*  Later, A.W. was sent home from preschool after he pushed another child from a ladder, causing bleeding.  *Id.*  Starting at age four, A.W. began expressing suicidal ideation and, on several occasions, obtained a knife and made threatening gestures toward himself, though apparently never with serious intent.  PAR114, R810, R1231.  Around the same time, A.W. began climbing out his second story bedroom window and threatening to jump from the roof.  R810, R1231.

6.  When A.W. was in third grade, his parents hired a board-certified behavioral analyst, Shealeen Stabelfeldt, to provide intensive in-home behavioral support.  PAR17, PAR102–111, R1231.  Following Stabelfeldt's recommendation (PAR110), the parents contacted a clinical psychologist at the University of Washington who performed a comprehensive evaluation on A.W. and diagnosed him with autism spectrum disorder in March 2014.  PAR112–125; *see* R5324.  Over the next two years, A.W.'s behaviors escalated, requiring emergency intervention on several occasions.

7.  In the summer of 2015, A.W. was admitted on two separate occasions to the Psychiatric and Behavioral Medicine Unit ("PBMU") at Seattle Children's Hospital.  The first admission occurred after A.W. locked himself in his room during a session with Stabelfeldt and began

---

[4] Brian W.'s supplements to the administrative record are Bates stamped "Brian W.[page number]."  *See* Dkt. Nos. 54–58.  These supplements reflect the appeal of Premera's denial of coverage for A.W.'s treatment at the Heritage School, which, as described below, Premera received but misplaced.  Premera agrees that the Court can consider the Heritage appeal records in this case.  Dkt. No. 78 at 47–48.  The Court cites these records as "PAR[page number]."

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 7

climbing out his bedroom window. R1322. The family called the police, who placed A.W. in a hold for over an hour before paramedics strapped him to a gurney and transported him to the hospital. *Id.* He spent eight days hospitalized following this incident. *Id.* In the second incident, A.W. began repeatedly hitting his mother while she was driving on the freeway because he did not want to go to dinner at his grandmother's house. *Id.* Unable to calm him down, A.W.'s mother drove him to the PBMU, where he spent another week before returning home. *Id.*

8. According to his parents, A.W.'s behavior became increasingly aggressive, especially toward his mother and brother, through the fall of 2015, ultimately escalating into contexts outside the home. *Id.* These aggressive incidents often ended with A.W. breaking down, crying, and saying he wanted to die. *Id.* At a birthday party in October 2015, A.W. refused to return an item to one of his friends and, when his mother asked him to leave with her, he proceeded to punch her in the cheek and resist leaving for twenty minutes. R1232–1233. After A.W.'s mother got him in the car and was driving home, A.W. removed his seatbelt and opened the car door. R1233. Following the incident, A.W. entered short-term residential treatment at Ryther Child Center in Seattle, where he remained for six weeks, returning home at the end of 2015. *Id.*

9. His return home unfortunately proved short-lived. A.W.'s parents reported increased aggression toward his mother and brother during a mid-winter break vacation in 2016. *Id.* Around this time, A.W. had a blowup in which he "ran outside, peed on the dog and tried to set the house on fire" before ultimately being restrained by the police. PAR168. In February 2016, A.W.'s parents took his brother to their grandparents' home for safety after an aggressive outburst in which A.W. bruised the family caregiver's arm. R1233, PAR168.

10. The day after this outburst, another crisis erupted during a session with Stabelfeldt in which A.W. "sat on [his mother], pulled his hair, spit on [his mother], and twisted and bruised Ms.

Stabelfeldt's arm[,]" causing injuries that required physical therapy (for which Stabelfeldt charged A.W.'s parents). R1233. Stabelfeldt filed a report with Child Protective Services ("CPS") that A.W.'s presence in the home created a danger to his sibling's safety. *Id.* His parents once again took A.W.'s brother to stay with their grandparents and readmitted A.W. to Ryther Child Center, where he remained for another six weeks. *Id.*

11. Ryther's medical director, Dr. Linda Ford, assessed A.W. at intake. PAR162–178. She noted that "[d]espite … extensive in home supports"—including a "behaviorally trained nanny" and "in-home [applied behavioral analysis] therapy"—A.W. had not "maintain[ed] the initial gains from previous residential treatment [at Ryther]" and was "unable to maintain in his home setting." PAR168, PAR176. Accordingly, Dr. Ford found that A.W. "will require a prolonged period of increased structure and behavioral intervention to train in the necessary ability to recognize and modulate anger episodes as well as probably an increase in medication to treat mood swings, specifically anger." PAR176–177. Dr. Ford "discussed with [A.W.'s] parents the need to move swiftly on finding a long term placement for [A.W.]" and noted that the parents had "begun the process of obtaining a place in a therapeutic boarding school." PAR177.

**D.    A.W.'s Stay at Cherry Gulch**

12. From Ryther, A.W. was transferred to Cherry Gulch, a treatment center and therapeutic boarding school in Idaho.[5] R1233. Six weeks into his stay, he received a comprehensive

---

[5] The parties disagree on whether Cherry Gulch should be called a therapeutic boarding school, as Premera describes it (Dkt. No. 45 at 2), or a residential treatment center, as Brian W. does (Dkt. No. 59 at 12). The record variably supports either label. *See, e.g.,* R3910, R4434, R7422 (referring to Cherry Gulch as a "residential treatment facility," "residential treatment center," or "RTC"); R4567 (referring to Cherry Gulch as "therapeutic boarding school"). But the parties have not cited any exclusion in the Plan for therapeutic boarding schools, and the Court has not been able to identify one. While Premera's final denial letter for Cherry Gulch refers to an exclusion for "private school or boarding school tuition," the letter goes on to discuss and rely on the facility's licensure status as the basis for denial. R1062. And, in any event, Premera never identifies a provision in the Plan containing a boarding school exclusion nor explains whether such an exclusion would apply to a "therapeutic" boarding school. Accordingly, the Court finds that whether Cherry Gulch is a "therapeutic boarding school" or "residential treatment center" has no bearing on the outcome of this case.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 9

psychiatric evaluation from an in-house psychiatrist, Dr. Si Steinberg. R7422–7424. Dr. Steinberg noted that "in spite of multiple interventions[,]" A.W. had continued to experience meltdowns at home and found that he met the criteria for autism spectrum disorder, attention-deficit/hyperactivity disorder, and unspecified anxiety disorder. R7422, R7424. While Dr. Steinberg found A.W. was "integrating nicely into the [Cherry Gulch] program[,]" he noted that A.W. has "historically" done "adequately out of home" but "falls apart at home[.]" R7424. As an action plan, he recommended tapering off Prozac because A.W. was "integrating into the program" and later "exploring an anti-anxiety alternative medication[.]" *Id.*

13. A.W. remained at Cherry Gulch for just over three years, during which time he received regular individual, group, and family therapy as well as continuing psychiatric visits with Dr. Steinberg and at least two other psychiatrists. *See* R1810–1875, R2009, R2293, R3316, R3424, R6551, R6867, R7197, R7340, R7957, R8108, R8430, R8915, R9473. Although A.W. had extended home visits throughout this time, he was not allowed his first home visit until over seven months after being admitted. *See* R1233, R1924, R2047, R2066, R2261, R2410, R2446, R2548, R2576, R2851, R3646, R3770, R7925, R7957, R7969, R8270, R8407, R8528, R8546, R8685, R8688, R9144, R9224, R9473, R9971, R10026, R10287, R10411. In general, A.W., his parents, and his care team reported improvements in A.W.'s ability to manage negative emotions and re-engage after setbacks. *See, e.g.,* R2851, R2902, R3802. Over the course of his stay, however, he continued to refuse to perform activities of daily living. *See, e.g.,* PAR2031, PAR2110, PAR2425, PAR2493, R3896. And, in several incidents, A.W. was physically aggressive toward others or threatened self-harm, requiring staff to restrain him and, in one incident, place him on suicide watch. *See, e.g.,* PAR2585, PAR2733, PAR2752–2753, R3555, R3600–3601.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 10

14. By the spring of 2019, A.W.'s parents began making plans to transition A.W. back home and enroll him in a "micro-school for neurodiverse learners[.]" R1234. A.W. left Cherry Gulch that summer. *Id.* Upon returning home, his parents enrolled him in a small private school, as just described, called Leadership Preparatory Academy ("LEADPrep") for the upcoming school year. *Id.*

**E.    A.W.'s Treatment at ViewPoint**

15. After returning home, A.W. began refusing to attend school or complete homework. R384. Six weeks into his time at LEADPrep, A.W. "became overwhelmed and walked out of the school building against the teacher's direction." R1234. He also resumed self-harming behaviors around this time, such as "pounding his head" and saying "he wanted to die" when he became distressed. *Id.*; *see also* R384 (describing how A.W. would "go dark" at "the slightest stressor" and express "suicidal ideation, hate[] [for] himself, [desire] to die, [and that he] thinks we hate him, etc."). A.W.'s parents enrolled him in Viewpoint Center, a residential treatment center in Syracuse, Utah, where he underwent another comprehensive diagnostic assessment. *See* R796–850.

16. A.W. remained at ViewPoint from October 18 to December 16, 2019. R1234. Over the course of his stay, ViewPoint prepared a "Multidisciplinary Report," which included a psychiatric evaluation, a therapeutic course of treatment, and a neuropsychological evaluation based on testing throughout A.W.'s time there. *See* R798, R801–834. All three components recommended sustained placement at a residential treatment center. The psychiatric evaluation signed by Chris Paegle, an advanced practice registered nurse ("APRN") and psychiatric-mental health nurse practitioner ("PMHNP"), states: "RTC level of care is recommended for A.W. at this time, as outlined in detail within the Resident Recommendations portion of the Therapeutic Course of Treatment[.]" R808. The neuropsychological evaluation signed by psychologist Jordan Rigby

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 11

echoes Paegle's recommendation, stating that A.W. "requires placement in not just a therapeutic school but a therapeutic residential treatment center where his instruction in coping skills and supervision will take place in all settings so that he can learn how to apply them in all settings under the careful watch of therapeutic instructors." R834. Finally, the therapeutic course of treatment prepared by social worker Britten Lamb recommended that A.W. "transition to a residential treatment center" to "help him improve his self-esteem, self-competency and self-mastery" and develop "distress tolerance, emotion regulation and interpersonal effectiveness skills." R812.

17. Premera initially denied coverage for ViewPoint for lack of medical necessity. R30–34. On appeal, however, an Independent Medical Review Organization overturned that determination, finding that A.W.'s treatment was clinically appropriate and that A.W. could not have been treated at a lower level of care. R4145–4150.

**F.      A.W.'s Stay at Heritage**

18. In December 2019, A.W. was discharged from ViewPoint and, on the recommendation of the Multidisciplinary Report, enrolled in a residential treatment center in Provo, Utah called the Heritage School, where he remained for approximately eighteen months. R1234. At Heritage, A.W. underwent another psychiatric evaluation signed by Heritage's medical director, Jamis Leeper, a doctor of nursing practice, APRN, and board-certified PMHNP. PAR5370–5371. The evaluation recommended that A.W. receive, among other things, "[i]ndividual, group, family, and milieu therapy." PAR5371.

19. Consistent with this recommendation, A.W. received regular therapy at Heritage as well as ongoing psychiatric assessments (PAR4911, PAR4915), though he occasionally refused appointments (PAR5019, PAR5037, PAR5061, PAR5069, PAR5153, PAR5170). A.W. was able

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 12

to have multiple home visits during his stay, sometimes for up to two weeks. PAR4962. And by the time of his discharge, his care team reported that A.W. had made "solid progress" and noted he "was engaging well in individual and family therapy sessions" and had "significantly" improved his self-confidence. PAR4915. Still, he encountered setbacks at Heritage, including incidents of property destruction, self-harm, physical aggression toward others, and being in possession of "dangerous contraband"—incidents that often resulted in staff placing A.W. in a "safety hold[.]" PAR4952, PAR4991, PAR4995, PAR5012, PAR5015, PAR5031, PAR5072, PAR5123, PAR5175, PAR5184, PAR5250. A.W. was discharged from Heritage in June 2021. R1234.

### G.      Brian W.'s Cherry Gulch Claim and Premera's Denial

20. Brian W. initially submitted claims for his son's Cherry Gulch treatment electronically to Blue Cross of Idaho ("BCID"). R4233. BCID declined to process the claims because it was unable to determine that Cherry Gulch was credentialed. R4233–4234. Brian W. then submitted the claims via certified mail to his Premera home plan. R4234. The U.S. Postal Service confirmed that the claims were delivered on December 14, 2020, but he received no response. *Id.* Then, on February 26, 2021, Brian W. submitted the claims again, this time electronically. *Id.* Weeks later, having still not received confirmation that his claims had been processed, Brian W. filed a complaint with the Washington State Office of Insurance Commissioner ("OIC"). R4233.

21. Premera responded and, over the course of the claims process, articulated evolving reasons for denying coverage. Its first denial notice was based on Brian W.'s failure to submit the claims within 365 days of A.W.'s discharge from Cherry Gulch pursuant to a limitation in the Plan. R1206–1214. Brian W. appealed the denial, and Premera reversed its decision that the claims were untimely filed. R4177. At the same time, Premera declined to approve coverage, this time stating that no prior authorization had been approved for A.W.'s Cherry Gulch treatment. *Id.* Under the

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 13

Plan, prior authorization is required for residential stays. R1314. But the penalty for failing to obtain authorization is a partial denial of coverage, up to a maximum penalty of $1,500 per occurrence—not full denial. *Id.* The second denial letter stated that, to process the claims, Premera needed more information and that Premera had already requested that information from Cherry Gulch. R4177.

22. A year later, Brian W. filed a second appeal—referred to in the Plan as a "Level II Appeal" (*see* R1062)—along with thousands of pages of supporting documents, including a CD with 3,980 pages of Cherry Gulch medical records. R1158. Premera submitted the appeal to a panel of its own employees as well as an external reviewer, Dr. James A. Phalen, a board-certified physician in pediatrics and pediatric developmental-behavioral medicine at AllMed Healthcare Management. R1062, R3909–3929.

23. In a report dated November 21, 2022, Dr. Phalen concluded that A.W.'s treatment was not medically necessary "based on the plan's criteria and provided clinical documentation." R3910. A form field directed Dr. Phalen to "explain in layperson's terms … why the request is being denied …, addressing each argument that the claimant raised, if any." *Id.* In response, he wrote, "[w]e received no clinical records to support this service. Without supporting clinical records, we must deny the request as not medically necessary."[6] R3910–3911. Dr. Phalen's report cited the InterQual criteria as among the materials he considered in making his determination. R3909.

---

[6] It is unclear if Premera never gave Dr. Phalen the clinical records from the appeal or if he simply overlooked them. The record should have included, among other things, Dr. Ford's evaluation from Ryther, Dr. Steinberg's assessment from Cherry Gulch, and thousands of pages of Cherry Gulch treatment records. While Dr. Phalen's report states there was "no diagnosis from a qualified diagnostician" and "no documentation of [A.W.'s] performance on standardized testing" (R3910), the record should also have included the 2014 University of Washington psychiatric evaluation diagnosing A.W.'s autism spectrum disorder and documenting his IQ results from standardized tests (R5324). Dr. Phalen also writes that he saw "no documentation regarding previous treatment tried and failed" (R3910), despite numerous records documenting attempts to treat A.W. with medication, an in-home therapist, an in-home behaviorally trained nanny, multiple admissions to the PBMU at Seattle Children's Hospital, and two periods of short-term residential treatment at Ryther. While these discrepancies are ultimately non-dispositive, Premera has offered no explanation for them.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 14

24. On December 1, 2022, Premera issued its final denial letter for Cherry Gulch. R1062. The letter neither referenced Dr. Phalen's medical necessity determination nor relied on either of the grounds given in the first two denial letters. *Id.* Instead, it stated:

> The plan language excludes coverage for private school or boarding school tuition, services not specifically listed under the Mental Health Care benefit as covered, and services provided by providers who do not meet the plan's definition of a provider. In states other than Washington, "provider" means health care practitioners and facilities licensed or certified consistent with the laws and regulations of the state in which they operate. It is of note that a copy of the facility's state license was never provided to confirm they meet the plan's definition of a provider.

*Id.* It is unclear if Premera ever requested a copy of Cherry Gulch's state license. *See* R4177 (state license not listed among records Premera requested from Cherry Gulch). In any event, Brian W.'s counsel filed a declaration in this case attaching copies of the facility's Idaho licenses to operate as a Children's Residential Care Facility during the relevant period. Dkt. No. 59-1. Premera no longer maintains that Cherry Gulch's licensure status is grounds for denying Brian W.'s claim. *See generally* Dkt. No. 45; *see also* Dkt. No. 78 at 39 (acknowledging that Cherry Gulch "may have the license" to operate as a residential treatment center, and arguing "but they are not actually advertising that's what they're doing").

25. Premera's final denial letter for Cherry Gulch lists the InterQual criteria as among the two dozen or so "records reviewed" in connection with A.W.'s claim. R1063. But none of Premera's three denial letters cite the criteria as the basis for the decision. R1062–1064, R1195–1199, R1206–1214. Only Dr. Phalen's independent review letter discloses them as the "[r]ationale" for his determination. R3911.

## H.    Brian W.'s Heritage Claim and Premera's Denial

26. Brian W. submitted his first claim for A.W.'s treatment at Heritage in December 2020 (R4932) and submitted subsequent claims in January 2021 (R4980) and periodically thereafter (*see*

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 15

R4984, R4988, R5000).   Premera issued Explanations of Benefits denying coverage for each month of treatment.  R4930–R5014.  Some of the notices state (without mentioning the InterQual criteria) that Premera's "medical staff reviewed this claim and determined that this service wasn't medically necessary."  *E.g.*, R4932, R4936, R4940, R4944, R4948.  Others state, without citing a Plan provision, that "[y]our plan does not provide benefits for residential treatment for treatment of mental health or psychiatric conditions."  *E.g.*, R4980, R4984, R4988.  Brian W. appealed the denials on September 17, 2021.  PAR1.  U.S. Postal Service indicated the appeal was delivered three days later (PAR2–3), and Premera confirms that it received the appeal (Dkt. No. 45 at 14).  But Premera never responded until this litigation and states that it mistakenly failed to upload the appeal into its system.  Dkt. No. 45 at 14.

27. Brian W. claims the appeal contained thousands of pages of medical records and other documentation.  *See* PAR1–5418.  Included was a letter from Dana Dean Doering ARNP, the family's therapeutic placement consultant, concurring with ViewPoint's discharge report that placing A.W. "in an intensive therapeutic residential treatment center" was "a medically necessary course of treatment."  PAR5386–5387.  In this lawsuit, Premera initially told Brian W.'s counsel it could not locate any record of the Heritage appeal and requested a copy.  Dkt. No. 36-1 at 3.  Later, Premera emailed again stating "Premera has located the Heritage appeal record" and produced 5,592 pages encompassing the appeal.  *Id.* at 2–3.  Brian W. discovered that Premera's production did not include "six exhibits submitted during the appeal."  Dkt. No. 38 ¶ 6.  Accordingly, Brian W. produced a "complete version of the Heritage appeal" to Premera (*id.* ¶¶ 6–7), which he later filed along with the briefing on the current motions.  PAR1–5017.  Premera filed a declaration by its paralegal, Megan K. Smith, stating that, although Premera received an appeal dated September 24, 2021, it was missing hundreds of pages, including the 476 pages of

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 16

records from Heritage. Dkt. No. 46. It is unclear how Premera's version of the appeal came to be in this state. There is no dispute, however, that Premera never asked Brian W. for the missing exhibits during the administrative process or informed him that Premera needed more information to process his claim.

28. In April 2022, Brian W. filed a complaint with the OIC about Premera's failure to respond to the Heritage appeal. R1218. Premera responded the next month, but apparently misread the complaint and understood it to pertain to the Cherry Gulch appeal rather than the Heritage appeal. R1245. Premera's response contained no information about the Heritage appeal, which Premera apparently never reviewed. *Id.*

## IV.    CONCLUSIONS OF LAW

**A.      Jurisdiction**

1. The Court has jurisdiction over this case under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

**B.      Brian W.'s Claim for Benefits**

    1.   Standards under ERISA

2. ERISA provides a cause of action for a participant in a covered plan "to recover benefits due to him under the terms of his plan[.]" 29 U.S.C. § 1132(a)(1)(B); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). As discussed above, the parties agree that the Court's review of Premera's denial of coverage is *de novo*. Under *de novo* review, the district court "examines the administrative record without deference to the administrator's conclusions to determine whether the administrator erred in denying benefits." *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022) (citing *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc)). Critically, the court's focus is on the specific reasons given by the

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 17

administrator for the denial. Thus, "[t]he district court's task is to determine whether the plan administrator's decision is supported by the record, not to engage in a new determination of whether the claimant" satisfied other plan requirements not relied on by the administrator. *Id.* ("[T]he district court must examine only the rationales the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process.").

3. Under *de novo* review, the Court "construe[s] the Plan in accordance with the rules normally applied to insurance policies." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 799 (9th Cir. 1997). Among these is the rule of *contra proferentem*, which requires courts to construe ambiguous policy terms against the insurer and "adopt [a] reasonable interpretation advanced by [the insured]." *Id.*; *see also Saltarelli v. Bob Baker Grp. Med. Tr.*, 35 F.3d 382, 386 (9th Cir. 1994) ("An insurer wishing to avoid liability on a policy … must make exclusionary clauses conspicuous, plain, and clear[.]" (citation modified)). The rule prevents insurers from taking advantage of vague language in insurance plans and protects the reasonable expectations of insureds who are forced "to guess and hope regarding the scope of coverage[.]" *Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir. 1990).

4. The Court begins by determining, *de novo*, whether the record supports the reasons Premera gave for its denial of the Cherry Gulch claim before turning to Premera's denial of the Heritage claim.

### 2. The Cherry Gulch Claim

5. The Court concludes that the record does not support the rationale Premera articulated in its letters denying benefits for A.W.'s treatment at Cherry Gulch. Premera's briefing argues that it correctly denied the claim because A.W.'s treatment was not "medically necessary" under the

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 18

Plan. *See* Dkt. No. 45 at 15–19, Dkt. No. 66 at 2–16. But Premera never cited medical necessity as the basis for denying the claim in its letters, and it cannot do so now. *See* R1062.

6. Premera's first denial notices were based on the timeliness of the claim. R1206–1214. Premera then reversed its decision, referenced the prior authorization requirement, and stated it was working on gathering additional records to process the claim. R4177. Finally, its letter denying the Level II Appeal mentions several coverage exclusions (none of which are the medical necessity requirement) and ultimately rejects coverage based on the Plan's definition of a "provider." R1062. The letter explains that, "[i]n states other than Washington," a "provider" must be "licensed or certified consistent with the laws and regulations of the state in which they operate" but that "a copy of [Cherry Gulch's] state license was never provided to confirm they meet the plan's definition of a provider." *Id.*

7. Ninth Circuit caselaw makes clear that the Court's task is to review *de novo* whether Premera's denial on *this* basis was correct. *Collier*, 53 F.4th at 1188 ("When a district court conducts a de novo review of a benefits denial, it evaluates the plan administrator's reasons for denying benefits without giving deference to its conclusions or opinions."). Claims administrators are not entitled to withhold "a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court[.]" *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 719 (9th Cir. 2012). This rule protects claimants from being "'sandbagged' by a rationale the plan administrator adduces only after the suit has commenced." *Id.* at 720 *(*quoting *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n. 2 (9th Cir. 2010)).

8. The pre-litigation disclosure requirement also flows directly from ERISA and its implementing regulations. ERISA requires a claims administrator who denies a claim to explain

in writing the "specific reasons for such denial" and provide a "full and fair review" of the decision. 29 U.S.C. § 1133(1)–(2). The regulations mandate that "[t]he specific … reasons for the adverse determination" be set forth "in a manner calculated to be understood by the claimant" and that the denial letter reference "the specific plan provisions on which the determination is based[.]" 29 C.F.R. § 2560.503-1(g)(1)(i)–(ii). Additional requirements apply to denials based on medical necessity, which must be accompanied by "an explanation of the scientific or clinical judgment for the determination" or "a statement that such explanation will be provided free of charge upon request." *Id.* § 2560.503-1(g)(1)(v)(B). These requirements promote fair claims practices by "enabl[ing] the claimant to prepare adequately for any further administrative review, as well as appeal to the federal courts." *Wolf v. Life Ins. Co. of N. Am.*, 46 F.4th 979, 986 (9th Cir. 2022); *see also Harlick*, 686 F.3d at 720 ("ERISA and its implementing regulations are undermined 'where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.'" (citation omitted)).

9. To the extent Premera claims to have denied coverage based on medical necessity, its final denial letter satisfied none of these requirements. The letter neither identifies medical necessity as a reason for denial, nor cites the medical necessity provision in the Plan, nor explains any "scientific or clinical judgment" supporting the decision. *See* 29 C.F.R. § 2560.503-1(g)(1)(i)–(ii), (v)(B); R1062–1067. Nor does it disclose its purported reliance on the InterQual criteria, as the regulations also require. *See* 29 C.F.R. § 2560.503-1(g)(1)(v)(A) (requiring that denial letter disclose "[i]f an internal rule, guideline, protocol, or other similar criterion was relied upon" and set forth, or offer to provide a copy of, such "rule, guideline, protocol, or … criterion"). Instead, the letter identifies "the plan's definition of a provider" as the reason for denial and states that

Premera never received a copy of Cherry Gulch's license. R1062. Premera argues that it adequately invoked the medical necessity requirement nonetheless by "includ[ing] Dr. Phelan's [sic] report" (which discusses medical necessity) with its denial letter. Dkt. No. 66 at 18–19. But the letter itself never mentions—much less relies on—Dr. Phalen's medical conclusions, giving Brian W. no indication that the report was the basis for the denial. R1062–1067.

10. Premera is not permitted to defend its denial based on reasons stated in Dr. Phalen's report but omitted from the letter simply because the report was attached (following hundreds of pages of other attachments) to the letter. Indeed, the Ninth Circuit in *Collier* rejected an administrator's attempt to do essentially this. In that case, the plan administrator denied a claim for long-term disability benefits because, as its denial letters explained, the claimant "did not meet the definition of disability" based "on the medical documentation received[.]" *Collier*, 53 F.4th at 1183. The denial letters never cited the claimant's lack of credibility. *Id.* at 1183. And while the final letter relied on two physicians' reports, it omitted any reference to "portions of both … reports" that questioned the claimant's "credibility in her pain symptom reporting." *Id.* at 1187. While the uncited portions might have supported that the claimant lacked credibility, the Ninth Circuit held that the district court erred in adopting the administrator's argument—raised for the first time in litigation—that the claim was properly denied for that reason. *Id.* at 1188. The court then remanded for the district court to review the denial anew, focusing exclusively on the reasons the administrator actually "raise[d] in the administrative process to deny benefits." *Id.* at 1189.

11. Premera falls even further short of meeting ERISA's disclosure requirements. Not only did its denial letter not rely on Dr. Phalen's medical conclusions, it never quotes the report at all, includes only an oblique reference to the report, and tucks the report behind over 200 pages of other attachments. *See* R1062 (referencing "[s]ame specialty review report" as among the records

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 21

"reviewed for your appeal"); *see also* R1066–1248. Because Premera failed to disclose its reliance on Dr. Phalen's conclusions or the InterQual criteria, Brian W. was "sandbagged" by the new rationales and denied the chance to introduce contrary evidence into the administrative record. *Harlick*, 686 F.3d at 720. The Court will therefore reject Premera's post-litigation reasons for denying the claim and will review *de novo* only the reason Premera gave during the administrative process.

12. Turning to this task, the Court concludes the record refutes Premera's stated rationale for denying the claim—i.e., Cherry Gulch's licensure status. R1062. Indeed, Premera makes no arguments defending this rationale, relying instead only on the medical necessity of the treatment under InterQual. *See* Dkt. No. 66 at 15–16, 18–19. Brian W. has presented uncontested evidence that Cherry Gulch was licensed at all relevant times by the Idaho State Department of Health and Welfare to operate as a Children's Residential Care Facility. *See* Dkt. No. 59-1. And Premera has never suggested that Cherry Gulch's health care services were "[in]consistent with applicable state requirements" under those licenses. R1350.

13. Accordingly, the Court concludes that the record does not "support[] the reasons on which [Premera] relied to deny benefits." *Collier*, 53 F.4th at 1182. The Court will therefore reverse Premera's decision to deny benefits as to A.W.'s Cherry Gulch treatment and award judgment to Brian W.

### 3. The Heritage Claim

14. The record also refutes Premera's reasons for denying benefits for A.W.'s treatment at Heritage. Premera's denial notices alternatively state that the claim was either denied because "[y]our plan does not provide benefits for residential [mental health] treatment" or because A.W.'s treatment was not "medically necessary." *See* R4932, R4936, R4940, R4944, R4948, R4980,

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 22

R4984, R4988.  The first reason is simply incorrect.  The Plan expressly provides mental health care benefits for "[i]npatient and residential facility care[.]"  R1369; *see also* PAR82.  Indeed, Premera paid benefits for A.W.'s residential mental health treatment at ViewPoint (after its initial medical necessity decision was overturned).  R4146.

15. The second reason is also incorrect.  To evaluate whether A.W.'s treatment was "medically necessary" as that term is defined in the Plan, the Court begins—as it does with all questions of contract interpretation—with the Plan's language.  *See Firestone Tire & Rubber Co.*, 489 U.S. at 112–13 (on *de novo* review, a court "review[s] the employee's claim as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.").  Where the terms of an ERISA plan are ambiguous, the Court may "examine extrinsic evidence to determine the intent of the parties."  *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)).

16. As described above, the Plan defines "medically necessary" as (1) "covered services" that (2) "a physician, exercising prudent clinical judgment, would provide to a patient" for the condition, and that are (3) consistent with "generally accepted standards of medical practice[,]" (4) "[c]linically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's" condition, and (5) not primarily for the convenience of the patient or provider or more costly than equally effective alternatives.  R1349.  For the reasons just discussed, residential mental health treatment is a covered service under the Plan.  *See* R1369; PAR82.  The Court will consider the Plan's four remaining components of medical necessity in turn.

a.    *Consistent with the prudent clinical judgment of a physician*

17. To begin, the record establishes that A.W.'s treatment at Heritage was consistent with what "a physician, exercising prudent clinical judgment, would provide" a patient with A.W.'s conditions. Indeed, every mental health professional who examined A.W. during the relevant times either expressly recommended residential treatment or found that A.W. benefited from the structure it provided. None found that his symptoms could be safely managed at a lower level of care.

18. For instance, every practitioner who treated A.W. at ViewPoint concurred in recommending residential treatment. In his twenty-page neuropsychological evaluation, Dr. Rigby carefully reviewed A.W.'s behavioral and treatment history, assessed the results of a battery of tests Rigby performed, and concluded that A.W. "requires a level of services that is more comprehensive than has been provided in outpatient or day treatment programs." R814–834. Dr. Rigby found that A.W.'s symptoms were consistent with his diagnoses of autism, ADHD, and anxiety (as well as other conditions) and recommended that A.W. secure "placement in not just a therapeutic school but a therapeutic residential treatment center where his instruction in coping skills and supervision will take place in all settings … under the careful watch of therapeutic instructors." R834. Similarly, nurse practitioner Chris Paegle recommended "RTC level of care" and "[o]ngoing psychiatric service … within his next treatment setting to monitor and adjust medications[.]" R808. And A.W.'s social worker, Britten Lamb, concurred, recommending that A.W. "transition to a residential treatment center[.]" R812.

19. Upon admission to Heritage, nurse practitioner Jamis Leeper echoed the need for structured, comprehensive treatment, recommending that A.W. receive "[i]ndividual, group,

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 24

family[,] and milieu therapy" (PAR5371), which A.W. participated in regularly at Heritage (PAR4911).

20. These recommendations are consistent with the earlier conclusions of A.W.'s physicians that lower levels of care were ineffective at treating A.W.'s symptoms. For instance, in A.W.'s 2016 evaluation at Ryther, Dr. Ford found that A.W. was "unable to maintain in his home setting" despite "extensive in home supports" and recommended "a longer term placement for" him. PAR176–77. Similarly, Dr. Steinberg's evaluation at Cherry Gulch observed that A.W. tended to "fall[] apart at home" but was "integrating nicely" into the structured program at Cherry Gulch. R7422–7424.

21. The clinical judgment of each of these practitioners is further confirmed by the independent medical review that overturned the denial of A.W.'s ViewPoint claim. The psychiatry professor and board-certified psychiatrist who reviewed A.W.'s claim found that residential treatment was medically necessary because, among other reasons, A.W. has "multiple co-morbid disorders[,]" "is at high risk for relapse[,]" "has failed to benefit from … treatment at lower levels of care," and "represents a safety risk to self and others." R4157. Since "lower level care had failed to produce sustained benefit" or "improvement" in A.W.'s "symptoms" or "behavioral problems[,]" the reviewer found that "[i]t is not reasonable to expect that [A.W.] could be … safely or effectively managed with lower level services in a less restrictive level of care[.]" *Id.* Thus, "[g]iven [A.W.'s] diagnosis and current health status," the reviewer concluded, "Residential Mental Health Treatment" at ViewPoint was "medically necessary for this patient." *Id.*

22. The record shows no meaningful change in A.W.'s symptoms immediately after his discharge from ViewPoint when he enrolled at Heritage. Indeed, A.W. was enrolled at Heritage due to the very same relapse in behaviors—the "worsening … of [A.W.'s] anxiety and depression,

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 25

school refusal, and [] decline in functioning" after he left Cherry Gulch—that led the independent reviewer to conclude A.W.'s treatment at ViewPoint was medically necessary. *Id.* The reviewer observed that these afflictions continued throughout A.W.'s stay at ViewPoint, right up to the point he was discharged and began treatment at Heritage. In particular, the reviewer noted that, throughout his stay, A.W. "continued to show boundary issues with peers[,]" "affective instability[,]" and "associated symptoms of anxiety and insomnia" and that "during the last month" at ViewPoint, "the treatment plan called for continued intensive treatment with regard to relational function[.]" R4155–4156.

23. In sum, every medical professional who treated A.W. as well as the independent physician who reviewed his ViewPoint claim agreed that A.W. needed residential mental health treatment.

24. By contrast, the record contains almost no evidence reflecting a contrary clinical judgment. According to Premera's denial notices, Premera's "medical staff reviewed" the Heritage claim and determined the "service[s] [weren't] medically necessary." *E.g.,* R4932. But the record does not contain the underlying clinical reviews, and Premera has not explained how its medical staff reached their conclusions. Failing to disclose a physician review that forms the basis of a denial violates "the statutory obligation of a fair review procedure" because it prevents the claimant from meaningfully contesting the review. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 680 (9th Cir. 2011). "Had [Premera] met its duty of providing copies of its physicians' evaluations, then [A.W.'s] treating physicians could have provided such comments and performed such additional examinations and tests as might be appropriate." *Id.* Because Premera did not, the record lacks both the rationale of Premera's medical staff and any rejoinder A.W.'s medical team might have given. In any event, the Court "gives greater weight to the opinions of the providers who actually treated and examined [A.W.] than to" undisclosed medical staff "who simply

reviewed the file." *N.C.*, 667 F. Supp. 3d at 1119; *see also Salomaa*, 642 F.3d at 676 (favoring the opinions of "physicians who actually examined" the claimant where the only physicians to conclude he was not disabled were those "the insurance company paid to review his file").

25. In sum, the record shows that A.W.'s treatment at Heritage was consistent with what "a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing, or treating an illness, injury, disease or its symptoms." R1349.

b.    *Consistent with generally accepted standards of medical practice*

26. Brian W. has also shown, by a preponderance of the evidence, that A.W.'s treatment at Heritage was consistent with "generally accepted standards of medical practice." R1349. The Plan defines this phrase to mean "standards that are based on credible scientific evidence published in peer reviewed medical literature generally recognized by the relevant medical community, physician specialty society recommendations and the views of physicians practicing in relevant clinical areas and any other relevant factors." *Id.* Reviewing identical language in another plan, the court in *N.C.* found it necessary to consult "sources of authority outside the Plan language to properly define this term" because the term's definition is "susceptible to multiple interpretations." 667 F. Supp. 3d at 1116. This Court agrees and observes that the language itself contemplates consulting "credible scientific evidence" outside the four corners of the Plan. R1349.

27. The parties propose alternative medical standards for assessing A.W.'s treatment. Brian W. advocates for considering the Child and Adolescent Level of Care/Service Intensity Utilization System ("CALOCUS/CASII") guidelines published by the American Academy of Child and Adolescent Psychiatry. Dkt. No. 59 at 9–10; Dkt. No. 68 at 12–13, 15. Premera, on the other hand, emphasizes the InterQual criteria, which it contends "provide the generally accepted medical

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 27

criterial [sic] for specific medical conditions[.]" Dkt. No. 66 at 3 (quoting R863). The Court will consider both guidelines in turn.

### (i) CALOCUS/CASII

28. As a preliminary matter, Premera contends that the Court may not consider the CALOCUS/CASII guidelines, which Brian W. submitted via supplemental briefing, because they are not in the administrative record. Dkt. No. 77 at 2–4. Typically, *de novo* review involves simply evaluating whether the evidence that was before the administrator supports its decision to deny benefits. *See Opeta v. Nw. Airlines Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007). As Premera acknowledges, however, "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review[,]" the Court "should exercise its discretion" to look outside the administrative record. *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 944 (9th Cir. 1995) (quoting *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)). Such circumstances include where there have been "very limited administrative review procedures with little or no evidentiary record"; where the extrinsic evidence concerns "interpretation of the terms of the plan rather than specific historical facts"; or where "there is additional evidence that the claimant could not have presented in the administrative process." *Opeta*, 484 F.3d at 1217 (quoting *Quesinberry*, 987 F.2d at 1027).

29. All three reasons warrant considering the CALOCUS/CASII guidelines here. First, the administrative review procedures for the Heritage claim were extremely limited (practically nonexistent) because, as Premera concedes, it lost Brian W.'s appeal and never responded. Second, the guidelines are not introduced to establish historical facts, but to interpret the term "generally accepted standards of medical practice" in the Plan. And third, Brian W. had no genuine opportunity to present the guidelines earlier because Premera never told him it had relied on its

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 28

own medical standards—the InterQual criteria—in denying the claim. Accordingly, the Court finds that considering the CALOCUS/CASII guidelines is "necessary to conduct an adequate *de novo* review" of the Heritage denial and is thus appropriate. *Mongeluzo*, 46 F.3d at 944 (citation omitted).

30. The Court also finds that the CALOCUS/CASII guidelines reflect credible, scientific standards generally recognized by the relevant medical community. While Premera mildly debates the evidence supporting the guidelines (Dkt. No 77 at 4–5), it acknowledges that "[c]ourts recognize that CASII is intended to reflect generally accepted standards for evaluating levels of care and service intensity" (*id.* at 6). Indeed, the cases Premera relies on to argue that A.W.'s care was medically unnecessary under CALOCUS/CASII support that the guidelines are a valid indicator of accepted standards of practice. *See J.M. v. United Healthcare Ins.*, No. 21 CIV. 6958 (LGS), 2023 WL 6386900, at *2, *4 (S.D.N.Y. Sep. 29, 2023) (finding that guidelines were "developed by professionals using an evidence-based approach" and are appropriate for determining the medical necessity of treatment); *S.L. by & through J.L. v. Cross*, 675 F. Supp. 3d 1138, 1160 n. 11 (W.D. Wash. 2023) (noting that "[n]umerous experts in the field of child and adolescent psychiatry spent years developing, refining and validating [CALOCUS/CASII]" and that both "are designed to reflect the generally accepted standards for evaluating levels of care and service care/intensity across the care continuum"). The Court agrees with these cases and will evaluate A.W.'s treatment under the guidelines accordingly.

31. CALOCUS/CASII sets out seven levels of care, from the least intensive, level zero—"Prevention and Health Maintenance[,]"—to the most intensive, level six—"Secure, 24 Hour Services with Psychiatric Management[.]" Dkt. No. 76-1 at 32–45. To determine the appropriate level of service intensity, the CALOCUS/CASII manual instructs the reviewer to evaluate six

dimensions, each of which are rated on a scale of one to five based on criteria, or "anchor points," specified in the manual. *Id.* at 9. The six dimensions are the child's (1) risk of harm to self or others; (2) functional status including the ability to engage in developmentally appropriate activities of living; (3) coexisting developmental, medical, substance use, and psychiatric conditions; (4) environmental stress and environmental support; (5) history of resiliency and response to services; and (6) engagement in services. *Id.*

32. To assign a rating to each dimension, the manual instructs that "[o]nly one of the anchor points in a severity level needs to be met for a score to be assigned for that dimension." *Id.* at 11. The reviewer is directed to "select the highest score or rating in which at least one of the anchor points is met." *Id.* If it is "unclear which rating fits best," reviewers are to err "on the side of caution" by assigning "the highest score in which it is more likely than not that at least one anchor point has been met[.]" *Id.* Finally, if there is a conflict between the level of care indicated by CALOCUS/CASII and the judgment of clinicians, the manual states that "clinical judgment supported by a clearly articulated rationale will take precedence." *Id.* at 58.

33. There is no dispute that A.W.'s level of treatment at Heritage constituted inpatient residential care, which falls within level five care under CALOCUS/CASII's rubric. The manual describes this level as "Non-Secure [i.e., unlocked], 24-Hour Services with Psychiatric Monitoring" that is typically "provided in non-hospital settings such as residential treatment facilities[.]" *Id.* at 40. A child can meet this level of intensity in one of two ways: first, if the child has a composite score of 23 to 27 across all six dimensions described above; or second, if the child has a rating of four or above in any one of the first three dimensions regardless of composite score. *Id.* at 54. Thus, under the second method, this level of care is automatically indicated if the child (1) poses a "[s]erious [r]isk of [h]arm" to self or others, (2) experiences "[s]erious [f]unctional

[i]mpairment" or (3) exhibits "[m]ajor [c]o-[o]ccurrence" of psychiatric, substance use, or other medical conditions. Dkt. No. 16, 18, 20.

34. The record supports that A.W.'s clinicians acted consistently with CALOCUS/CASII in recommending residential treatment at Heritage. Brian W. contends, among other things, that A.W. meets the automatically qualifying anchor points in both the "risk of harm" and "functional status" dimensions. Dkt. No. 75 at 5–6. The Court agrees.[7]

35. Among the level four anchor points that automatically qualify a patient for residential treatment under the "risk of harm" dimension is "significant impulsivity and/or physical … aggression, with poor judgment and insight … that is … significantly endangering to self or others" (e.g., "property destruction"). Dkt. No. 76-1 at 16. To name just a few incidents matching this description, at Cherry Point, A.W. grabbed a peer by the hair, cranking his neck back (R3893); whipped a peer with a dog collar (R3713); threatened to punch peers with a cocked fist (R3275); and attempted to fight other students and destroy gym equipment, leading staff to place him in a containment hold (R3600–R3601). Another level four anchor point is "[c]urrent suicidal ideation with" a "past history of carrying out such behavior." Dkt. No. 76-1 at 16. A.W. has an extensive history of suicidal ideation and acting out suicidal behavior since he was four years old. *See, e.g.,* PAR114. He was placed on suicide watch at Cherry Gulch after displaying suicidal behavior (R3555) and, upon leaving Cherry Gulch, resumed self-harming behavior like "pounding his head" and saying "he wanted to die" (R1234). All this is consistent with the independent review physician's conclusion that A.W. "represents a safety risk to self and others." R4157. Thus, A.W.

---

[7] Because the Court agrees that the record establishes A.W.'s qualifying rating in these two dimensions, it does not consider whether A.W. also achieves a qualifying rating in the third dimension, co-occurrence of conditions, or if his composite score across all dimensions indicates a residential treatment level of care.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 31

meets the anchor points to automatically indicate residential treatment under the risk of harm dimension.

36. The same is true of the "functional status" dimension. The qualifying anchor points under this dimension include "[c]onsistent failure to achieve self-care/hygiene at levels appropriate to age and/or developmental level." Dkt. No. 76-1 at 18. At Cherry Gulch, A.W. consistently refused basic hygienic activities such as showering and changing clothes. *See, e.g.,* R3053 (observing A.W.'s pattern of progress toward regular showering, followed by quitting and refusing regular hygiene), R3896 (refusing hygiene), PAR2031 (same), PAR2110 (same), PAR2425 (same), PAR2434 (same). Immediately before his admission to Heritage, A.W.'s neuropsychological evaluation by Dr. Rigby at ViewPoint observed that A.W.'s hygiene was significant enough concern "to have an impact on him establishing relationships with peers." R828. In particular, Dr. Rigby recounted concerns with A.W.'s "enuresis and encopresis" (involuntary urination and defecation), including a recent incident of suspected "passage of feces into … the shower[.]" *Id.* Thus, A.W. also meets the anchor points to automatically indicate residential care under the functional status dimension.

37. In sum, the CALOCUS/CASII guidelines strongly support that the clinical judgment of A.W.'s treating practitioners was consistent with generally accepted standards of medical practice.

*(ii)* InterQual criteria

38. Premera advocates for using the InterQual criteria and contends that A.W.'s failure to meet the criteria "mandates" judgment in its favor because these criteria authoritatively represent the applicable standard of medical care. Dkt. No. 66 at 3, 14. Applying the doctrine of *contra proferentem*, however, the Court concludes that the term "generally accepted standards of medical practice" must be construed against rigid application of Premera's preferred criteria and consistent

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 32

with Brian W.'s reasonable expectations. *Saltarelli*, 35 F.3d at 386; *Kunin*, 910 F.2d at 540. Here, Brian W.'s expectations were reasonably informed by the judgment of A.W.'s clinicians and the CALOCUS/CASII guidelines.

39. Premera defends its reliance on InterQual by citing numerous cases applying the abuse of discretion standard and upholding an insurer's decision to deny claims based on the criteria. Dkt. No. 45 at 18–19 (citing *N.F. v. Premera Blue Cross*, No. C20-0956-JCC, 2021 WL 4804594, *4 (W.D. Wash. Oct. 14, 2021); *S.L. v. Premera Blue Cross*, 675 F. Supp. 3d 1138, 1150 (W.D. Wash. 2023); *K.K. v. Premera Blue Cross*, No. C21-1611-JCC, 2023 WL 3948236, at *4 (W.D. Wash. June 12, 2023). However, the court's task in each of those cases was significantly narrower than it is here. The abuse of discretion standard limits courts to evaluating whether a denial was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676. That courts have upheld an insurer's reliance on InterQual under this standard does little to support Premera's contention that on *de novo* review, the InterQual criteria represent the authoritative medical standards—particularly where, as here, Premera did not even cite InterQual in its denial notices.[8]

40. Under *de novo* review, "courts have refused to rely exclusively on particular third-party classifications where the plan has not explicitly referenced them[.]" *Heasley v. Belden & Blake Corp.*, 2 F.3d 1249, 1261 (3d Cir. 1993) (collecting cases). This makes sense because relying exclusively on extrinsic criteria not found in the plan "effectively imposes a new requirement for

---

[8] Premera also cites *Todd R. v. Premera Blue Cross Blue Shield of Alaska*, which upheld a claim denial on *de novo* review but did not involve the InterQual criteria. *See* No. C17-1041-JLR, 2021 WL 2911121, *18 (W.D. Wash. July 12, 2021). In that case, the insurer denied coverage for treatment that failed to meet different care guidelines that were "incorporated into Premera's Medical Policy" and that the claimant never challenged. *Id.* at *14. Finally, Premera cites *Peter B. v. Premera Blue Cross*, which applied the abuse of discretion standard to uphold a claim denial that did not involve the InterQual criteria. No. C16-1904-JCC, 2017 WL 4843550, *5 (W.D. Wash. Oct. 26, 2017)). Neither case suggests that the Court must defer to Premera's reliance on the InterQual criteria as the sole indicator of the applicable standard of care.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 33

coverage[,]" which plan administrators are prohibited from doing. *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 459–60 (9th Cir. 1996).   As Premera conceded at oral argument, the Plan does not incorporate the InterQual criteria by reference.  Dkt. No. 78 at 32.

41. In another case where "the InterQual guidelines [were] not incorporated by reference into the Plan," Judge John H. Chun of this Court held that "[t]he Court is not bound" on *de novo* review "to rely exclusively on these guidelines and may consult alternate sources of evidence and authority." *N.C.*, 667 F. Supp. 3d at 1115.  Like Judge Chun, this Court finds it "troubling" that Premera seeks "to exclude coverage based on … extraneous and rigid standards … not explicitly referenced in the Plan language[.]"  *Id.*  Contrary to Premera's interpretation, the Court must construe any ambiguity in the Plan's definition of "medically necessary" in favor of Brian W.'s reasonable expectations, which in this case includes the expectation that the unanimous judgment of A.W.'s medical team and the CALOCUS/CASII guidelines reflect "generally accepted standards of medical practice." *Saltarelli*, 35 F.3d at 386; *Kunin*, 910 F.2d at 540.

42. In any event, it is far from clear that InterQual would not also indicate residential treatment in this case.  Premera's briefing largely focuses on applying the InterQual criteria to A.W.'s Cherry Gulch treatment, rather than the Heritage treatment.  But Premera generally argues that A.W. would not meet the criteria's requirements for residential care because he did not exhibit sufficiently persistent qualifying symptoms over a six-month period.  *See* Dkt. No. 45 at 20–21. Premera acknowledges, however, that the InterQual criteria recommend residential treatment "in cases where an individual cannot be managed safely in the community yet doesn't require the services of an inpatient hospitalization."  Dkt. No. 66 at 10; R1594.  The conclusions of A.W.'s medical team and the independent review physician that A.W. could not be safely treated at lower

levels of care indicates that A.W.'s treatment at Heritage was, in fact, consistent with the InterQual criteria in this regard. Similarly, the InterQual criteria involve considering factors such as persistent "[a]ggression" or "[p]oor impulse control with harm to self or others" that is "unresponsive to adult de-escalation" over a period of six months or more (R1548)—factors also present in A.W.'s case based on his medical history and evaluations.

43. In sum, considering both the CALOCUS/CASII and InterQual criteria as relevant evidence of the applicable standards, the Court finds that A.W.'s treatment at Heritage was consistent with "generally accepted standards of medical practice" as that term is defined in the Plan.

c.    *Clinically appropriate*

44. For many of the reasons stated above, A.W.'s medical records from Heritage establish that his treatment was clinically appropriate in terms of type, frequency, extent, site, and duration, and was considered effective for treating his conditions. As in *N.C.*, his care team "was comprised of various mental health professionals with graduate level training." 667 F. Supp. 3d at 1122; *see* PAR4916 (treatment team at Heritage included Jamis Leeper, DNP, APRN, PMHNP-BC; Shaelyn Warthen, CSW; and George Ballew, LCSW). A.W. received biweekly group therapy, weekly individual and family therapy, and daily skills development and milieu therapy at Heritage. PAR4911. And A.W. met with a psychiatrist regularly—albeit, not weekly, as Premera claims the InterQual criteria demand—for both medication management and psychiatric evaluations. *See* PAR4915, PAR4925. A.W.'s team prepared a master treatment plan, which it reviewed and updated periodically, identifying goals, sub-objectives, and target dates for completing the goals. PAR4919–4928, PAR4961–4964, PAR5022–5025, PAR5083–5085, PAR5264–5267.

45. A.W.'s treatment at Heritage therefore satisfies the Plan's requirement that treatment be clinically appropriate.

d.    *Not primarily for convenience or more costly than effective alternatives*

46. Finally, A.W.'s treatment at Heritage was not "primarily for the convenience of the patient, physician, or other health care provider" or "more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."  R1349.  Consistent with the findings of the mental health practitioners who evaluated A.W., the Court concludes that A.W.'s symptoms could not have been safely treated at a lower level of care.

47. To begin, A.W.'s breakdown that precipitated his admission to Heritage did not happen in a vacuum but, rather, followed a years' long history of failed interventions.  A.W.'s admission to Cherry Gulch came on the heels of multiple, escalating crisis incidents in which A.W.'s concerning behaviors led to his hospitalization, interactions with the police, a CPS complaint regarding his brother's safety, and persistent concern that A.W. might hurt himself or others.  For years, A.W.'s parents attempted to address these symptoms with counseling, medication, and the support of an in-home therapist and behaviorally trained nanny.  But A.W. continued to exhibit suicidal ideation and threats, severe anxiety, and physical and verbal aggression, especially toward his mother and younger brother.

48. After his stay at Cherry Gulch, A.W.'s parents again attempted to treat his conditions at a lower level of care but were unsuccessful.  Almost immediately upon leaving residential care and enrolling at LEADPrep, A.W.'s symptoms regressed and he began to experience incidents of "pounding his head" and saying "he wanted to die[.]"  R1234.  These culminated in A.W. becoming "overwhelmed" at LEADPrep and walking out without his teacher's permission.  *Id.* After this, his medical team at ViewPoint unanimously agreed that lower levels of care would not be effective and that A.W. needed "placement in not just a therapeutic school but a therapeutic

residential treatment center[.]" RR834; *see also* R808, R812. Recounting all of this history in her letter supporting the Heritage appeal, nurse practitioner Dana Dean Doering concurred, explaining how A.W. experienced "significant difficulties with normal daily activities" when treated at lower levels of care, and that "placement in an intensive therapeutic residential treatment center was required." PAR5386–5387. This conclusion is echoed by the independent review physician who overturned the ViewPoint denial, finding that "[i]t is not reasonable to expect that [A.W.] could be … safely or effectively managed with lower level services in a less restrictive level of care for the time frame under review." R4157. Because A.W. continued to pose "a safety risk to self and others" at lower levels of care, the reviewer concluded that residential mental health treatment was medically necessary. *Id.* As discussed above, the record does not indicate a meaningful change in A.W.s' condition immediately after his discharge from ViewPoint.

49. Consistent with the conclusions of each of these clinicians and reviewers, the Court finds that A.W. could not have been safely treated in a non-residential context and that his care at Heritage was thus not more costly than effective alternatives or primarily for convenience.

50. Accordingly, Brian W. has shown by a preponderance of the evidence that Premera's denial of the Heritage claim based on medical necessity was erroneous.

### 4. Remand of the Heritage claim is unnecessary.

51. Premera finally contends that, rather than award benefits, the Court should remand the Heritage claim back to Premera to restart the administrative appeals process because Premera never processed Brian W.'s appeal. The Court rejects this proposal.

52. Where an administrator fails to comply with ERISA's procedural requirements, "the court can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits." *Demer v. IBM Corp. LTD Plan*, 835 F.3d

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 37

893, 907 (9th Cir. 2016) (quoting *Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 24 (1st Cir. 2003)).  Remand is unnecessary if "but for the insurer's arbitrary and capricious conduct, the insured would have continued to receive the benefits or" if "there was no evidence in the record to support a termination or denial of benefits."  *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) (citation modified); *see also Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463–65 (9th Cir. 1997) (remanding with instructions to enter judgment for claimant where administrator failed to comply with ERISA's "meaningful dialogue" requirements and record clearly showed claimant's entitlement to benefits); *Salomaa*, 642 F.3d at 680–81 (similar).  Courts will decline to remand where the plan documents do not confer discretion on the administrator and where the denial of benefits was contrary to the factual record.  *See Grosz-Salomon*, 237 F.3d at 1163 (remand was "not justified" where "the operative plan documents d[id] not confer discretion" and the insurer simply "came to the wrong conclusion" in applying the plan's definition of "disabled"); *see also Maher v. Aetna Life Ins. Co.*, 186 F. Supp. 3d 1117, 1131 (W.D. Wash. 2016) (declining to remand where administrator "applie[d] the right standard" but simply "reache[d] the wrong conclusion" (citation omitted)).

53. Here, Premera is not entitled to "a second bite at the apple when its first decision was simply contrary to the facts."  *Grosz-Salomon*, 237 F.3d at 1163.  Premera's initial process fell well short of the "full and fair review" ERISA mandates.  28 U.S.C. § 1133(2).  Its denial notices relied on purported lack of medical necessity but failed to provide or offer "an explanation of the scientific or clinical judgment for the determination," as required by regulation.  29 C.F.R. § 2560.503-1(g)(v)(B).  More troublingly, Premera concedes it "received [Brian W.'s] appeal" but never responded to it.  Dkt. No. 45 at 14.  Apparently, the appeal was lost—i.e., it "was by accident not uploaded into Premera's appeal system[.]"  *Id.*  When Brian W. complained to the OIC,

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 38

Premera failed to read the complaint closely enough to notice conspicuous details—such as the name of the service provider (Heritage) or the dates of service (January 2020 to June 2021)—that should have alerted it that the complaint was unrelated to the Cherry Gulch appeal. *See* R1218. Premera's response letter assures the OIC that "[w]e carefully reviewed the correspondence from Brian [W.]" and his "appeal history" but goes on to describe the status of an entirely different appeal—never acknowledging the discrepancies on the face of the OIC complaint. R1245. While the Court has no reason to doubt Premera's representation that the lapses here were an honest mistake, the process that resulted utterly failed to provide the "meaningful dialogue" ERISA requires. *Booton*, 110 F.3d at 1463.

54. Forcing Brian W. to slog through the administrative process again after Premera failed to meaningfully participate in that process the first time is unwarranted—particularly where, as here, the Plan does not confer discretion on Premera that it would be entitled to exercise in the first instance. *See Grosz-Salomon*, 237 F.3d at 1163 (affirming reinstatement of benefits without remand where review was *de novo* and administrator simply "came to the wrong conclusion" in applying the plan's standards). As discussed above, the record establishes that Premera misapplied the "medically necessary" requirement when it denied A.W.'s Heritage claim. Accordingly, the Court will not remand to Premera to reconsider the claim and will instead award judgment in favor of Brian W.

C.    **Breach of Fiduciary Duty and Injunctive Relief**

55. Because Brian W. is entitled to benefits under 29 U.S.C. § 1132(a)(1)(B), the Court will not award equitable relief for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("[W]here Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief[.]"). ERISA does

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 39

not authorize duplicative recoveries under § 1132(a)(1)(B) and § 1132(a)(3).  *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 961 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016).  At oral argument, Brian W.'s counsel stated that, if the Court awarded benefits under subsection (a)(1)(B), the only additional relief Brian W. would seek under (a)(3) would be equitable surcharge for the costs Brian W. incurred during the administrative appeal.  Dkt. No. 78 at 25.   But while Brian W. is free to move for "reasonable attorney's fee[s]" related to this litigation and for the "costs of [this] action" pursuant to § 1132(g)(1), "fees incurred during 'the administrative phase of the claims process' are not recoverable" under either § 1132(g) or § 1132(a)(3).  *Castillo v. Metro. Life Ins. Co.*, 970 F.3d 1224, 1228, 1233 (9th Cir. 2020).

56. Because Brian W. has not requested any non-duplicative relief pursuant to § 1132(a)(3) that is within the Court's power to award, the Court will dismiss his breach of fiduciary duty claim.

## V.    MOTION TO STRIKE AND REQUEST FOR JUDICIAL NOTICE

Finally, Brian W. moves to strike certain exhibits reflecting the webpages or former webpages of Cherry Gulch and Heritage, as well as statements by Premera's counsel explaining Premera's failure to respond to Brian W.'s Heritage appeal.  Dkt. No. 59 at 18–19.   Premera requests that the Court take judicial notice of the exhibits containing the webpages.  Dkt. No. 66 at 22.  The Court has reviewed the disputed exhibits and statements and concludes they do not affect the outcome of the case.  The Court will therefore deny the motion to strike and the request for judicial notice as moot.

## VI.   CONCLUSION

The Court GRANTS Brian W.'s motion in part and awards judgment for him on his claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B).  The Court DENIES Brian W.'s motion to strike as moot.  And the Court DENIES Premera's motion for summary judgment.

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 40

By April 13, 2026, the parties shall (1) meet and confer to resolve the amount of unpaid benefits due, and (2) submit a proposed judgment consistent with the terms of this order.

Dated this 13th day of March, 2026.

Kymberly K. Evanson
United States District Judge

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR JUDGMENT UNDER FRCP 52 AND MOTION TO STRIKE - 41